J-S40001-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.P.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3609 EDA 2017 |

Appeal from the Decrees Entered October 24, 2017
in the Court of Common Pleas of Philadelphia County
Family Court at Nos.: 51-FN-002124-2010
CP-51-AP-0000896-2017
CP-51-DP-0002681-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.P.C. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: E.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3616 EDA 2017 |

Appeal from the Orders Entered October 24, 2017
in the Court of Common Pleas of Philadelphia County
Family Court at Nos.: 51-FN-002124-2010
CP-51-AP-0000897-2017
CP-51-DP-0002680-2016

BEFORE: LAZARUS, J., DUBOW, J., and PLATT*, J.

MEMORANDUM BY PLATT, J.: **FILED AUGUST 20, 2018**

E.D. ("Father") appeals from the decrees and orders entered October

24, 2017, which granted the petition of the Department of Human Services

_____

\* Retired Senior Judge assigned to the Superior Court.

("DHS") and terminated his parental rights to his children, Aa.M.P.C. and Au.M.P.C.,[1] (both born in August 2015), pursuant to section 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S.A. § 2511, and changed the Children's permanency goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351.  We affirm.

We adopt the following facts and procedural history from the trial court's opinion, which in turn is supported by the record.  (**See** Trial Court Opinion, 3/05/18, at 1-9; **see also** N.T. Hearing, 10/24/17, at 1-43).

Father and V.C. ("Mother") became known to DHS following the death of Mother's child, the then thirty-month-old Sa.C., in October 2010.  Father claimed that she had urinated on herself and he took her to the bathroom to wash her before leaving her in the tub while he checked on the child's sibling.  When he returned, Sa.C. was having difficulty breathing.  She was taken to Aria-Torresdale Hospital and pronounced dead.  Sa.C. had suffered bruising to her left ribs, flank, thighs, and the left side of her face; she also had a lump on her forehead.  An autopsy revealed evidence of old trauma and injuries, and no water in her lungs.  Mother informed DHS that the forehead lump was sustained during rough play with Sa.C.'s sister, N.C., and Father claimed the rib injuries were sustained when he attempted to perform cardio-pulmonary

---

[1] As this case involves minor children, we have redacted names to protect the identities of the children involved.  However, there are multiple children with identical initials in this case.  Therefore, to distinguish between them where necessary, we refer to each child by the first two letters of their first names.

resuscitation ("CPR") on Sa.C. Mother and Father were unable to explain Sa.C.'s other injuries.

DHS and police investigations were opened with regard to the death of Sa.C. Her siblings, N.C. and Sy.C., were removed from the home and placed with their maternal grandfather. DHS determined that Father's account of the incident was not credible. Ultimately, the medical examiner determined that Sa.C.'s manner of death was homicide and the cause of death was multiple blunt force injuries and cardiac arrest. As a result, DHS obtained an Order of Protective Custody ("OPC") for N.C. and Sy.C., who were committed to DHS but remained in the care of their maternal grandfather. In November 2010, the court adjudicated N.C. and Sy.C. dependent.

In June 2011, the court found aggravated circumstances existed based on the death of Sa.C. and made a finding of child abuse. DHS requested 1) that the court allow DHS to work with Mother towards reunification with N.C. and Sy.C., and 2) that DHS need not make reasonable efforts to reunite Father with the N.C. and Sy.C. The court granted both requests. Later that month, DHS returned a founded report of child abuse and aggravated circumstances against Mother and Father.

In June 2011, Mother gave birth to Se.C., who was discharged into her care; Father was identified as Se.C.'s father and in-home services were implemented to ensure Se.C.'s safety. In July 2012, the court adjudicated Se.C. dependent, ordered DHS to supervise her, and directed that the criminal stay-away order against Father remain. The court found aggravated

circumstances regarding both Mother and Father, and ordered that efforts be made to preserve the family with regard to Mother, but no efforts towards reunification were necessary as to Father.

In August 2012, Father was convicted of endangering the welfare of a child.[2] In October 2012, Father was convicted of a drug-related offense. Mother gave birth to two more children, D.D., Jr., and L.C., in January 2013 and January 2014, respectively. Their putative father, D.D., Sr., informed DHS that he did not want D.D., Jr., around Father, who was again living with Mother.

In June 2014, DHS made an unannounced visit to Mother's house and Father answered the door. Mother claimed that Father did not reside there. Regardless, the matter was scheduled for an adjudicatory hearing, where the court issued a stay-away order against Father. The court committed Se.C. to DHS. In September 2014, the court discharged the temporary commitment of D.D., Jr., who was in the custody of his father; issued another stay-away order against Father; ordered L.C. and Se.C. remain in status quo; ordered a paternity test for Father as to Se.C.; and involuntarily terminated the parental rights of Mother as to N.C.

In September 2014, D.D., Sr., was murdered. D.D., Jr., was placed temporarily with his maternal grandfather, who also had kinship care of N.C. and Sy.C. In October 2014, a paternity test revealed that Father was L.C.'s

---

[2] *See* 18 Pa.C.S.A. § 4304(a)(1).

- 4 -

biological father. That same month, DHS held a Family Service Plan ("FSP") meeting, setting reunification goals for Se.C. and L.C. and for D.D., Jr., to remain in the home, and objectives for both Mother and Father. In December 2014, D.D., Jr., was placed in foster care.

In January 2015, the court fully committed D.D., Jr., to DHS, ordered the stay-away order against Father as to Se.C. remain in place, and directed that he was to have no in-person visits with L.C. until further order of the court, but that DHS could explore Skype visits. In March 2015, the court kept the same orders in place as to Father, and voluntarily terminated the parental rights of Mother as to Sy.C. Community Umbrella Agency ("CUA") implemented services for the family. In June 2015, CUA held a Single Case Plan ("SCP") meeting, setting objectives for both parents. Mother was to participate in grief therapy, obtain safe housing, and attend visitation; Father was to keep in contact with CUA, comply with his objectives and stay-away order, and keep Skype visits. In August 2015, the Children who are the subject of the instant appeal – Au.M.P.C. and Aa.M.P.C. – were born.

In May 2016, CUA modified Father's objectives and recommended that he participate in individual therapy and follow recommendations. In July 2016, a parenting capacity evaluation of Father recommended that Father obtain consistent employment and housing, and participate in counseling to assist in understanding how his behavior had played a role in the death of Sa.C. If reunification was to remain a goal, visitation should not be increased until Father made progress in the other objectives. Further, the evaluation

noted that there were several issues interfering with Father's ability to provide safety and permanency to his children. These issues included: 1) lack of consistent employment; 2) lack of appropriate housing as a result of his inconsistent employment; 3) his history of multiple arrests; and 4) his lack of insight and ability to anticipate and react to situations that were potentially dangerous for the Children.

In November 2016, DHS received a report alleging that Mother was unable to protect Aa.M.P.C. and Au.M.P.C. Mother allegedly maintained a relationship with Father and allowed him to see the Children, despite the fact that she had obtained a Protection From Abuse ("PFA") order against him. DHS visited Mother's home several times in an attempt to investigate the allegations, but were unable to contact her.

Mother later contacted DHS and denied that Father was the biological father of Aa.M.P.C. and Au.M.P.C. She informed DHS that she worked from 7:00 a.m. to 3:00 p.m. and that her mother supervised the Children during those hours. DHS unsuccessfully attempted two more visits before filing a motion to compel cooperation with a child protective services investigation; the court granted the motion.

During further investigations in December 2016 and January 2017, Mother denied that she had contact with Father or that he had been to her home, and claimed her last contact with him was in 2014. However, in January 2017, DHS discovered Father's "alias" page on Facebook, in which there were pictures and videos of him with Aa.M.P.C. and Au.M.P.C. in

- 6 -

Mother's home and in the community. DHS obtained an OPC for the children and placed them in foster care; later, the temporary commitment was ordered to stand and a stay-away order was issued against Father. The Support Center for Child Advocates were appointed as counsel and guardian *ad litem* ("GAL") for Aa.M.P.C. and Au.M.P.C. on January 17, 2017. On January 9, 2017, Father's parental rights to Se.C. and L.C. were involuntarily terminated.

DHS determined there was sufficient basis to find that aggravated circumstances existed pursuant to 42 Pa.C.S.A. § 6302(2) and (5), as 1) Father had been arrested and convicted of the wrongful death of Sa.C.; and 2) Father's parental rights to other children had been terminated.

In February 2017, the court adjudicated Aa.M.P.C. and Au.M.P.C. dependent, committed them to DHS, and found aggravated circumstances by clear and convincing evidence as to Mother. The court ordered that no further efforts be made to preserve the family and reunify Aa.M.P.C. and Au.M.P.C. with Mother. In April 2017, the court found that clear and convincing evidence established aggravating circumstances as to Father, and ordered that no efforts be made to preserve the family and reunify the Children with Father.

In September 2017, DHS filed petitions seeking to involuntarily terminate Father's parental rights and change the Children's permanency goal to adoption. In October 2017, the court held a hearing on the termination and goal change petitions. Father was represented by counsel, although he chose not to testify on his own behalf. (**See** N.T. Hearing, 10/24/17, at 2). Aa.M.P.C. and Au.M.P.C. were represented by a child advocate, Angelique

- 7 -

Kuchta, Esquire. (*See id.* at 2, 4). Tieshima Brown, a social worker and CUA case manager, and Dr. Erica Williams, the forensic psychologist who had performed Father's parenting capacity evaluation, testified. Following the conclusion of DHS' case in chief, during which the GAL concurred that Father's parental rights should be terminated, the court granted the petition pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b), and entered decrees terminating Father's parental rights. The court issued orders changing the Children's permanency goals to adoption.

On November 2, 2017, Father contemporaneously filed a timely notice of appeal and a concise statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(i). The trial court filed its opinion on March 5, 2018. *See* Pa.R.A.P. 1925(a).

On appeal, Father raises a single question for our review:

Whether there was a legal basis for terminating Father's parental rights pursuant to 23 Pa.C.S.A. [§] 2511(a)(1), (2), (5), (8) and (b) [and] to change [the] goal from reunification to adoption[?]

(Father's Brief, at 6) (unnecessary capitalization omitted).

Essentially, Father claims that he was not given adequate time to address his Section 2511(a) incapacity such that the court could make an accurate assessment of the Section 2511(b) requirement for termination of his parental rights. (*See id.* at 13-15). He contends that six months was not enough time to complete his goal of achieving mental health services, and that the only evidence in the record of his non-compliance with that objective is that he never provided documentation to the social worker assigned to his

- 8 -

case. (*See id.* at 14). Further, Father claims there was no evidence he was not compliant with the stay away order. (*See id.* at 15).

We review cases involving the termination of parental rights according to the following standards.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. [A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Here, the court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Termination requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). To affirm, we need only agree with any one of the subsections of 2511(a), as well as subsection (b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). We focus our analysis on sections (a)(1), (2), and (b).

The relevant sections of 23 Pa.C.S.A. § 2511 provide that:

**(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (b).

Essentially, Father's argument revolves around the fact that six months is not enough time for meaningful efforts at reunification. He cites no case law in support of his contentions and, accordingly, risks waiver. *See In re Estate of Whitley*, 50 A.3d 203, 209-10 (Pa. Super. 2012), *appeal denied*, 69 A.3d 603 (Pa. 2013) (noting that argument portion of appellate brief must contain discussion and citation of pertinent authorities and failure to cite relevant legal authority constitutes waiver of claim on appeal); *see also* Pa.R.A.P. 2101; Pa.R.A.P. 2119(a)-(c). Moreover, his claim is without merit.

"A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation and emphasis omitted). With respect to Section 2511(a)(1),

> [o]nce the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

Further,

> the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the

> individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

***In Interest of: T.J.J.M.***, 2018 WL 2947885, at \*7 (Pa. Super. filed June 13, 2018) (emphasis and citations omitted).

Here, Father references the Juvenile Act, 42 Pa.C.S.A. § 6351(f)(9)(iii) (enumerating findings the court should make at permanency hearings) in support of his contention that he was given insufficient time to address his goal of mental health services. (***See*** Father's Brief, at 14-15). However, Section 6351 provides that:

> (9) If the child has been in placement for at least 15 of the last 22 months **or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made** or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:
>
> \*   \*   \*
>
> (iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

42 Pa.C.S.A. § 6351(f)(9)(iii) (emphasis added). Presumably, Father is attempting to rely on subsection (iii) and its language that the court will not continue in termination actions where the family has not been given the necessary services in the time frames set forth in the permanency plan.

However, the court found aggravated circumstances existed, namely, Father's conviction for endangering the welfare of a child in connection with the death of Sa.C. As a result, the court held that no reasonable efforts needed to be made to reunify Father and the Children, and, accordingly, this section does not support Father's argument.

The evidence clearly established Father's failure to perform his parental duties in the six months prior to termination. Testimony demonstrated that Father did not comply with his reunification objectives, including to 1) maintain contact with CUA; 2) comply with the stay-away order which prohibited visitation with the Children; and 3) obtain therapy. (**See** N.T. Hearing, 10/24/17, at 24-26). CUA could not verify that Father was compliant with or attending mental health treatment, and Father only contacted CUA twice during the six-month time period. (**See id.** at 23-25). In those scant contacts, Father did not inquire about Aa.M.P.C. or Au.M.P.C., send cards, gifts, or seek any kind of communication or visitation with the Children. (**See id.**). Further, considering the entire history of the case, Father has also shown minimal compliance with court orders and objectives; his violation of several stay-away orders resulted in the Children being placed in care. Accordingly, the trial court appropriately determined that Father's parental rights should be terminated pursuant to Section 2511(a)(1).

Additionally, although we need only find termination appropriate under one section, it is worthwhile to examine the court's reliance on subsection 2511(a)(2). The petitioner for involuntary termination under this section must

prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *See In Interest of Lilley*, 719 A.2d 327, 330 (Pa. Super. 1998) (citation omitted). The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied. *See Z.P.*, *supra* at 1117. Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties. *See id.* at 1117-18.

Here, the clear and convincing evidence of record showed that Father had a continued incapacity to care for the Children that could not be remedied. Father has at best minimally complied with his objective to attend mental health treatment or counseling. (*See* N.T. Hearing, 10/24/17, at 24-25). This is especially concerning given the death of Sa.C., and Father's lack of acceptance of "responsibility for his role in any of this that's going on." (*Id.* at 25). Thus, because the record showed that Father was either incapable of or refused to address his objectives, the record supported the termination of his rights under Subsection (a)(2). *See Lilley*, *supra* at 330.

Next, we must consider whether the Children's needs and welfare will be met by termination pursuant to Subsection (b). *See In re Z.P.*, *supra* at 1121. "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Id.* (citation omitted). The court is

- 14 -

not required to use expert testimony, and social workers and caseworkers may offer evaluations as well. ***See id.*** Ultimately, the concern is the needs and welfare of the child. ***See id.*** "[W]here there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists." ***In re: K.Z.S.***, 946 A.2d 753, 762-63 (Pa. Super. 2008).

We have noted that

> [b]efore granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

***In re Z.P.***, ***supra*** at 1121 (citation omitted). We may not consider any effort by the parent to remedy the conditions in subsection (a)(1) if that remedy was initiated after the parent was given notice of the filing of the termination petition, and this evidentiary limitation applies to the entire termination analysis. ***See id.***

Here, the trial court accepted as credible the social worker's testimony that Father had not developed bonds with Aa.M.P.C. and Au.M.P.C.; that it was in the Children's best interests to be adopted; and that their current foster parent was able to provide necessary care and permanency for the Children. (***See*** N.T. Hearing, 10/24/17, at 25, 41-42; Trial Ct. Op., at 8). Prior to being

- 15 -

placed, the Children were not permitted to have contact with Father. (***See*** N.T. Hearing, 10/24/17, at 23). While there was some evidence that Father had been in contact regardless, there was no evidence introduced to establish that Father had bonded with the Children: indeed, the social worker testified that, during two calls, Father never once asked about their welfare. (***See id.*** at 23-24). In contrast, the Children refer to their foster mother as "mom" and have good interactions with her. (***Id.*** at 32).

Thus, we conclude that the clear and convincing evidence of record supports the termination of Father's parental rights under Sections 2511(a)(1) and (2), as well as the Section 2511(b) findings that there was no bond between Father and the Children, and that adoption would best serve their needs and welfare. ***See In re Z.P.***, ***supra*** at 1121.

Finally, Father challenged the goal change to adoption in his Pa.R.A.P. 1925(b) statement of errors complained of on appeal and purports to preserve that challenge in his brief. (***See*** Rule 1925(b) Statement, 11/02/17, at 1; Father's Brief, at 6). However, as Father does not address this issue in his brief in any meaningful way, neither citing to authority nor developing argument regarding it, we find he has waived it for purposes of appeal. ***See Whitley***, ***supra*** at 209-10; ***see also*** Pa.R.A.P. 2101; Pa.R.A.P. 2119(a)-(c).

Accordingly, we affirm.

Decrees affirmed. Orders affirmed.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/20/18</u>